IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAYMOND SCOTT, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| | : | NO. 19-580 |
| ANDREW SAUL,[1] | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

Raymond Scott ("Scott" or "Plaintiff") seeks review, pursuant to 42 U.S.C. § 405(g), of the Commissioner of Social Security's ("Commissioner") decision denying his claim for Supplemental Security Income ("SSI").[2] For the reasons that follow, Scott's Request for Review will be DENIED.

**I.  PROCEDURAL HISTORY AND BACKGROUND**

Scott was born on December 17, 1977. R. at 26.[3] He has a tenth-grade education, id. at 188, and is able to communicate in English, id. at 26. He does not have past relevant work experience. Id. On June 23, 2016, Scott protectively filed an application for SSI pursuant to Title XVI of the Social Security Act. Id. at 15. He alleged that he had become disabled on

---

[1]  Andrew Saul, the current Commissioner of Social Security, has been automatically substituted as the Defendant in this case pursuant to Fed. R. Civ. P. 25(d).

[2]  In accordance with 28 U.S.C. § 636(c), the parties voluntarily consented to have the undersigned United States Magistrate Judge conduct proceedings in this case, including the entry of final judgment. See Doc. Nos. 3, 7.

[3]  Citations to the administrative record will be indicated by "R." followed by the page number.

January 1, 2009 due to post-traumatic stress disorder, "post gunshot wounds," plate in left middle finger, metal plate in right forearm, bullet lodged in right arm, "reconstructed [k]nuckle left hand," herniated disc, bulging disc, and "left thumb needs plastic surgery." Id. at 75-76. His application was initially denied on September 30, 2016. Id. at 15. Scott then filed a written request for a hearing on November 3, 2016. Id. A hearing before an Administrative Law Judge ("ALJ") was held on August 16, 2018. Id. On October 31, 2018, the ALJ issued an opinion finding that Scott was not disabled. Id. at 12-33. Scott filed a timely appeal with the Appeals Council on November 21, 2018. Id. at 158-59. On December 28, 2018, the Appeals Council denied Scott's request for review, thereby affirming the decision of the ALJ as the final decision of the Commissioner. Id. at 1-6. Scott then commenced this action in federal court.

## II. THE ALJ'S DECISION

To prove disability, a claimant must demonstrate some medically determinable basis for a physical or mental impairment that prevents him or her from engaging in any substantial gainful activity for a 12-month period. 42 U.S.C. § 423(d)(1). As explained in the applicable agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled. (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an

adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920 (references to other regulations omitted).

In her decision, the ALJ found that Scott suffered from the following severe impairments: degenerative disc disease of the cervical and lumbar spine, history of a fracture at the base of the distal phalanx of the left thumb, depressive disorder, anxiety disorder, and a history of substance abuse in reported remission for the past six months. R. at 17. The ALJ did not find that any impairment, or combination of impairments, met or medically equaled a listed impairment and determined that Scott retained the residual functional capacity ("RFC") to:

> Perform light work as defined in 20 CFR 416.967(b) except that he can never climb ladders, ropes, or scaffolds with occasional climbing stairs, stooping, kneeling, crouching, crawling, and fingering with the left hand. He is also limited to no more than occasional exposure to extreme temperature with no exposure to unprotected heights. Finally, he is limited to the performance of simple and routine tasks and is able to make simple work-related decisions with only occasional public interaction.

Id. at 20. Based on this RFC determination, and relying on the vocational expert ("VE") who appeared at the hearing, the ALJ found that there were jobs that existed in significant numbers in the national economy that Scott could perform, such as cleaner, cafeteria attendant, and poultry dresser. Id. at 27. Accordingly, the ALJ concluded that Scott was not disabled. Id.

## III. SCOTT'S REQUEST FOR REVIEW

In his Request for Review, Scott contends that the ALJ erred by: (1) improperly finding that he retained the mental capacity to perform a range of unskilled work; (2) failing to include an established limitation in the hypothetical posed to the VE; (3) improperly finding that he retained the physical capacity to perform light work; and (4) failing to consider the impact of his fatigue on his ability to perform sustained work activity.

3

## IV.     DISCUSSION

### A.     Social Security Law

The role of the court in reviewing an administrative decision denying benefits in a Social Security matter under 42 U.S.C. § 405(g) is "limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact." Schwartz v. Halter, 134 F. Supp. 2d 640, 647 (E.D. Pa. 2001); see also Richardson v. Perales, 402 U.S. 389, 401 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (internal quotation marks omitted); see also Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (Substantial evidence "'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting Pierce v. Underwood, 487 U.S. 552, 564-65 (1988))). A reviewing court may not undertake a de novo review of the Commissioner's decision in order to reweigh the evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986). The court's review is plenary as to the ALJ's application of legal standards. Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).

### B.     The ALJ's Determination That Scott Had the RFC to Perform a Range of Unskilled Work Was Supported by Substantial Evidence

Scott contends that the ALJ's mental capacity RFC assessment was not supported by substantial evidence because the ALJ did not properly evaluate the opinions of his psychological consultative examiner, Brook Crichlow, Psy.D., or the State agency psychologist, Thomas Fink,

4

Ph.D. Pl.'s Br. (Doc. No. 11) at 3-7.

Scott was referred to Dr. Crichlow for a psychological evaluation. R. at 79, 372-76. Dr. Crichlow conducted an examination on September 15, 2016. Id. at 372-76. Upon examination, Dr. Crichlow explained that Scott "was asleep and had to be woken up while waiting in the lobby." Id. at 372. She noted that he lost his balance while walking down the hallway and seemed lethargic. Id. Scott reported that he had been "moving between family member households and ha[d] not had stable housing for the past five years." Id. Dr. Crichlow noted that Scott had never been hospitalized for psychiatric reasons. Id. Dr. Crichlow also noted that Scott reported that he had difficulty sleeping, had a fluctuating appetite, felt depressed and sometimes hopeless, and isolated himself. Id. at 373. He denied any suicidal or homicidal ideation. Id. Dr. Crichlow advised that Scott "reported that people stress him out, so he stays by himself." Id. Scott informed Dr. Crichlow that he can dress, bathe, and groom himself, and that he can manage his own money. Id. at 375.

Upon examination, Dr. Crichlow found that Scott was "an unreliable historian." Id. at 373. She described Scott as lethargic and uncoordinated. Id. She also determined that he "was at times[] disoriented, and his thought patterns were disorganized," but at "[o]ther times during the evaluation he was energized, coherent and enthused." Id. at 374. His hygiene and grooming were poor and he dressed disheveled. Id. His posture was normal and his eye contact was appropriate. Id. He had some slurring in his speech and pronunciation difficulties, but his expressive and receptive language abilities were adequate. Id. His thought process was tangential and paranoid, his affect was restricted, his mood was flat, and his sensorium was mildly impaired. Id. He was alert and oriented, but he had difficulties remembering his age. Id. His attention and concentration and recent and remote memory skills were impaired due to

5

"potential cognitive difficulties." Id. His cognitive functioning was below average and his general fund of information was limited. Id. Dr. Crichlow listed his insight and judgment as poor. Id. at 375. Dr. Crichlow diagnosed Scott with unspecified trauma and stressor-related disorder, unspecified depressive disorder, and unspecified other substance-related disorder, and recommended that Scott receive mental health care services. Id. She listed his prognosis as poor. Id.

Dr. Crichlow completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). Id. at 377-79. She opined that Scott had marked limitations in his ability to understand and remember simple or complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. Id. at 377. She found that he had moderate limitations in his ability to carry out simple instructions and make judgments on simple work-related decisions due to his memory difficulties resulting from "medical condition [and] hx of PCP use." Id. She determined that he had marked limitations in responding appropriately to usual work situations and to changes in a routine work setting, but moderate limitations in interacting appropriately with the public, supervisors, and coworkers due to his tendency to isolate himself, his disorganized thought patterns, and anxiety in social settings. Id. at 378.

The ALJ gave partial weight to Dr. Crichlow's opinion. Id. at 25. According to the ALJ, "the assessment of moderate to marked functional limitations appear[ed] to rely too heavily on the subjective complaints of the claimant as it is unsupported by the record as a whole." Id. The ALJ relied specifically on Scott's medical treatment records, which included "minimal discussion of [Scott's] alleged depression and anxiety." Id. Moreover, the ALJ concluded that the "record contains minimal mental health treatment records which document generally normal findings on mental status examination." Id. Finally, the ALJ noted that Scott "testified that he

achieved improvement in the clarity of his thinking when he stopped using drugs and alcohol six months before the hearing and that his minimal mental health treatment was helpful as it made him feel better about life." Id. at 25-26.

The ALJ's determination that Dr. Crichlow's opinion was only entitled to partial weight was supported by substantial evidence. As an initial matter, a consultative examiner's opinion is never entitled to controlling weight. See 20 C.F.R. § 416.927(c)(2). Regardless, the opinions of non-treating physicians are to be evaluated using the same criteria used to evaluate opinions from other medical sources, including: the length of the treating relationship and frequency of examination; the nature and extent of the treating relationship; supportability; consistency; specialization; and other relevant factors. Id. § 416.927(c)(1)-(6). While it is essential that an ALJ set forth reasons for his or her decision, an ALJ is not required to use particular language or adhere to a specific formula or format in conducting the analysis. Jones, 364 F.3d at 505. The ALJ need only provide a "'discussion of the evidence' and an 'explanation of reasoning' for his [or her] conclusion sufficient to enable meaningful judicial review." Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009) (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Scott argues that the ALJ erred in rejecting Dr. Crichlow's opinion because it was based on Scott's own subjective complaints. Here, the ALJ did not entirely dismiss Dr. Crichlow's opinion, as she found that Scott had moderate limitations in interacting with others and concentrating, persisting, or maintaining pace. R. at 18-19. She addressed Scott's limitations by restricting his RFC to permit only work that is limited to "simple and routine tasks," with the ability to make simple work-related decisions with only occasional public interaction. Id. at 20. To the extent the ALJ found that Dr. Crichlow relied on Scott's recounting of his symptoms, "[a]

7

medical source does not transform [a] claimant's subjective complaints into objective findings simply by recording them . . . ." Hatton v. Comm'r of Soc. Sec., 131 F. App'x 877, 879 (3d Cir. 2005). The ALJ determined that Scott's self-reporting regarding the extent of his symptoms was not entirely credible. R. at 23. When an ALJ finds a claimant's testimony regarding the severity of his or her symptoms not credible, he or she may discount medical opinions that are based on the claimant's self-reporting of symptoms. Morris v. Barnhart, 78 F. App'x 820, 825 (3d Cir. 2003); Gartland v. Colvin, No. 3:13-cv-02668-GBC, 2015 WL 5695311, at *21 (M.D. Pa. Sept. 28, 2015); McCormick v. Comm'r of Soc. Sec., No. 12-227, 2013 WL 2187537, at *9 (W.D. Pa. May 21, 2013); Gilmore v. Barnhart, 356 F. Supp. 2d 509, 512-13 (E.D. Pa. 2005).

Moreover, a review of the record reflects that the ALJ's statement that "the assessment of moderate to marked functional limitations . . . is unsupported by the record as a whole," R. at 25, is accurate. The only mental health treatment notes in the record relate to Scott's June 21, 2017 psychiatric evaluation at NorthEast Treatment Centers ("NET"). Id. at 565-71. At that time, he was using PCP and marijuana, reported that life was "unmanageable," had passive suicidal ideation, felt like "he can't make it," had poor sleep, felt poverty was "weighing him down," and was unemployed. Id. at 566. He denied any previous psychiatric treatment. Id. at 567. Upon mental examination, he was tearful and uncomfortable, but had logical speech and thought processes, euthymic mood and affect, logical thought content, intact perception and cognitive functioning, and good judgment and insight. Id. at 570. He was diagnosed with major depressive disorder, chronic pain, and PCP/marijuana abuse, for which it was recommended he take Cymbalta and Neurontin. Id. at 571. As part of his "Master/Comprehensive Treatment and Recovery Plan," it was recommended that he undergo individual and group therapy. Id. at 581. His long-term goals included "begin stable employment in a more desirable job and . . . report

8

improved satisfaction level regarding financial status, along with actively attending a GED program of [Scott's] choice." Id. at 582. Scott was discharged from NET's Behavioral Health and Social Services program on August 21, 2017, however, due to non-attendance. Id. at 606. His prognosis at that time was listed as poor due to "non-attendance to the program." Id. In addition to his limited mental health treatment records, Scott's other medical records often listed him as alert and oriented as well as having a normal mood and affect upon examination. See, e.g., id. at 439, 443, 449, 456.

The ALJ also based her decision to afford partial weight to Dr. Crichlow's opinion on Scott's own testimony at the administrative hearing. Id. at 25-26. At the administrative hearing, Scott testified that he had stopped using either PCP or marijuana for approximately six or seven months. Id. at 53. Since that time, he testified that his clarity had improved. Id. at 53-54. He also testified that although he had stopped going to therapy, he felt like the programs he attended "help[ed] a lot." Id. at 54-55. Moreover, when explaining to the ALJ at the administrative hearing why he was unable to work, neither Scott nor his attorney identified Scott's mental health impairments. For example, Scott's counsel's opening statement made no mention of Scott's mental impairments:

> The claimant has a remote history of gunshot wound affecting mostly the upper extremities. Since the alleged onset date, he's sustained multiple additional injuries, including a fracture of the thumb. He also has had MRI's that show very definitive disc herniations in both the cervical and the lumbar spine. As noted, he is currently receiving pain management injections which have provided some relief, but unfortunately only temporary relief, so we would submit that due to an inability to perform more than sedentary work with the added complication of ineffective use of the upper extremities, he would be incapable of performing any full-time work on a sustained basis.

Id. at 38-39. When asked to explain why he was unable to work, Scott himself stated that it was due to his pain. Id. at 51, 52-53. The ALJ was entitled to credit Scott's statements regarding his improved clarity at the hearing in formulating his RFC.

9

Accordingly, the ALJ afforded only partial weight to Dr. Crichlow's proposed limitations because she found that the limited records of Scott's mental health treatment and his own testimony did not support them. Id. at 25-26. Social Security regulations expressly direct an ALJ to consider both whether a physician provides evidence to support his or her opinion, 20 C.F.R. § 416.927(c)(3), and the extent to which the opinion is consistent with the record as a whole, id. § 416.927(c)(4). By comparing Dr. Crichlow's opinion to Scott's treatment records and testimony, the ALJ was not usurping the role of a medical source, but was merely performing her assigned judicial function. Zapata-Alvarez v. Colvin, No. 14-2830, 2015 WL 5179477, at *7 (E.D. Pa. Sept. 4, 2015) (ALJ finding medical opinion inconsistent with record was not substituting lay opinion for that of the doctor).

Scott also argues that the ALJ erred in giving the State agency psychologist's opinion great weight. Pl.'s Br. at 6-7. The State agency psychological consultant, Dr. Fink, opined that Scott was able "to meet the basic mental demands of simple tasks on a sustained basis despite the limitations resulting from [his] mental impairment." R. at 87. The ALJ afforded this assessment "great weight." Id. at 25. The ALJ concluded that this assessment was consistent "with the minimal mental health records including the initial treatment evaluations and consultative examinations documenting the claimant's reported issues with memory and interaction, but also his high level of reported daily activities and interactions and his generally normal findings on the only mental status examination documented by a treating source." Id. The ALJ noted that "[t]hose findings include tearful and uncomfortable appearance, logical speech and thought processes, euthymic mood and affect, no evidence of risk to self/others, logical thought content, intact perception and cognitive functioning, and good insight and judgment." Id.

Scott contends that the ALJ's affording great weight to Dr. Fink's opinion is undermined

by Dr. Fink's summary of Dr. Crichlow's consultative examination findings. Pl.'s Br. at 6-7.

Specifically, Dr. Fink opined:

> Claimant alleges a mental disability. This allegation is partially consistent with available MER. The claimant has 10 years of education and no history of psychiatric hospitalizations. Claimant is not currently involved in outpatient mental health treatment. At a 9/15/16 MSE (Crichlow) he was alert, oriented, nonpsychotic and grossly intact cognitively. [H]e was diagnosed with unspecified depressive disorder, trauma related disorder and D&A abuse. This report is given great weight.
>
> Current ADL functioning is mentally intact. Claimant can shop, manage money, handle change, use public transportation, and manage self-care and household care functions, within his physical limitations.
>
> Claimant can understand and follow simple instructions, remember locations and work-like procedures, relate and communicate with others, meet schedule demands, persist at simple tasks and make simple decisions. Memory is grossly intact. The claimant would be able to maintain regular attendance and be punctual. The claimant is able to carry out very short and simple instructions. In spite of a history of difficulty interacting with others, the claimant retains the ability to ask simple questions and accept instructions.
>
> The claimant is able to meet the basic mental demands of simple tasks on a sustained basis despite the limitations resulting from the mental impairment.

R. at 87. Scott disputes Dr. Fink's characterization of the findings in Dr. Crichlow's report, in particular Dr. Fink's statement that Scott was "alert" at the evaluation. Pl.'s Br. at 6. Contrary to Scott's claim, however, upon examination, Dr. Crichlow found that Scott was "alert and oriented." R. at 374. Moreover, Dr. Fink also evaluated Scott's activities of daily living and lack of current mental health treatment or history of psychiatric hospitalizations. Id. at 87. Indeed, Scott reported that his activities of daily living included going for walks, going to the store, preparing his own meals, washing clothes, using public transportation, getting groceries, watching television, playing cards, and visiting family and friends. Id. at 227-31. The ALJ's determination that Dr. Fink's finding of mild to moderate functional limitations was entitled to great weight is supported by substantial evidence in the record, and the ALJ was entitled to credit

11

these limitations.  See, e.g., Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (holding that "where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit"); see also Salerno v. Comm'r of Soc. Sec., 152 F. App'x 208, 209-10 (3d Cir. 2005) (affirming an ALJ's decision to credit the opinion of the non-examining state agency reviewing psychologist because his opinion was more supported by the record than the opinions of the treating physician and the consultative examiner); Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (contradictory opinions by state agency physicians provided a sufficient basis for refusing to give a treating physician's conclusory opinion controlling weight).

Ultimately, this Court is not authorized to reweigh the evidence de novo.  Monsour Med. Ctr., 806 F.2d at 1190.  The fact that Scott can point to some evidence that would support his position "does not undermine the Commissioner's decision so long as the record provides substantial support for that decision."  Malloy v. Comm'r of Soc. Sec., 306 F. App'x 183, 186 (D.N.J. 2016).  The ALJ's decision here is supported by substantial evidence.

### C. Substantial Evidence Supports the ALJ's Hypothetical Question to the VE

Scott alleges that the ALJ erred by failing to include an established limitation in the hypothetical she posed to the VE. Pl.'s Br. at 7-8.  Here, in both the RFC and the hypothetical posed to the VE, the ALJ limited Scott to simple and routine tasks with the ability to make simple work-related decisions.  R. at 20, 69.  Scott maintains that this RFC assessment and hypothetical were not supported by substantial evidence because the ALJ did not properly account for Scott's moderate difficulties with concentration, persistence or pace, relying on Ramirez v. Barnhart, 372 F.3d 546 (3d Cir. 2004). Pl.'s Br. at 7-8.  This contention, however, is meritless.

When questioning a VE, an ALJ's hypothetical question must accurately convey all "credibly established limitations." Rutherford, 399 F.3d at 544. "Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response." Id. However, it is the ALJ's responsibility to determine a claimant's RFC. 20 C.F.R. § 416.946. An ALJ's formulation of a claimant's RFC represents his or her decision as to "the most [the claimant] can still do despite [his or her] limitations." Id. § 416.945(a)(1). Accordingly, in determining a claimant's RFC, the ALJ is only required to include credibly-established limitations and not every limitation alleged. Rutherford, 399 F.3d at 554.

Recently, in Hess v. Comm'r of Soc. Sec., 931 F.3d 198, 209 (3d Cir. 2019), the Third Circuit addressed Ramirez and clarified that "[o]ur case law supports the conclusion that the findings at steps two and three are important to the ALJ's statement of a claimant's limitation but do not require the use of any particular language." The Third Circuit determined that "Ramirez did not hold that there is any categorical prohibition against using a 'simple tasks' limitation after an ALJ has found that a claimant 'often' faces difficulties [or has moderate limitations, due to a change in the regulatory rating scale] in 'concentration, persistence, or pace.'" Id. at 212. The Third Circuit then held that a "simple tasks" limitation is appropriate after a finding of "moderate" difficulties in "concentration, persistence, or pace," if a "valid explanation" is given. Id. at 211. Here, the ALJ determined that Scott had "moderate" limitations with concentration, persistence or pace, R. at 19, and limited his RFC to "simple and routine tasks with the ability to make simple work-related decisions," id. at 20. In addition, the ALJ limited Scott to "only occasional public interaction." Id.

The ALJ adequately explained why Scott's "moderate" difficulties in concentration,

13

persistence, or pace were not so significant that Scott was incapable of performing "simple tasks." For example, the ALJ explained that Scott was able to maintain an "ongoing high level of regular activities" that included attending to his personal care, shopping, traveling alone on public transportation, paying bills, preparing meals, doing some household chores, reading, watching television, playing cards, and attending appointments. Id. at 19 (citing id. at 218-26, 227-44); id. at 26. Moreover, as discussed supra in Section IV(B), the ALJ relied on Scott's own testimony that he has experienced improved clarity in his thinking since he stopped taking drugs. R. at 19. Finally, the ALJ relied on the minimal mental health treatment records, which documented normal findings on mental status examinations, to support the limitation to simple tasks. See supra Section IV(B). Consequently, the ALJ's explanation as to why Scott was limited to simple and routine tasks with the ability to make simple work-related decisions was more than sufficient.

### D. The ALJ's Determination That Scott Had the RFC to Perform a Range of Light Work Was Supported by Substantial Evidence

Scott argues that the ALJ improperly discounted the opinion of David B. Klebanoff, M.D., the physical consultative examiner, when determining that Scott was capable of performing a limited range of light work. Pl.'s Br. at 9-11. This claim lacks substance.

Scott was referred to Dr. Klebanoff for an internal medicine examination on September 15, 2016. R. at 353-57. Dr. Klebanoff indicated that Scott had suffered from a gunshot wound in 2001 to his right mid-back area, left hand area, and right forearm area that continued to cause pain in his back, thumb, and forearm. Id. at 353. Scott had also been in two motor vehicle accidents that aggravated his back pain. Id. Dr. Klebanoff reported that although he did not have a back brace with him for the examination, Scott had been in physical therapy and been wearing a back brace since his 2001 injury. Id. at 354. Dr. Klebanoff reported that Scott's

activities of daily living included cooking, cleaning, doing laundry, and shopping.  Id.

Upon examination, Dr. Klebanoff stated that Scott was a well-developed, well-nourished male in no acute distress, although during the examination it was noted that he was somnolent, which Scott reported was medication-related.  Id. at 355.  His gait was normal and he could walk on heels without difficulty.  Id.  His squat was 50 percent, during which he exhibited lower back discomfort.  Id.  However, his stance was normal, he used no assistive devices, he needed no help changing for the exam or getting on and off the exam table, and he was able to rise from the chair without difficulty.  Id.  He had no scoliosis, kyphosis, or abnormality in the thoracic spine.  Id. at 356.  His straight leg raises were negative bilaterally in both a seated and supine position.  Id.  There was no evidence of joint deformity and his joints were stable and nontender with no redness, heat, or effusion.  Id.  Dr. Klebanoff noted that there was minimal tenderness to palpation of the bullet wound area in the right thoracic area.  Id.  His strength was "4/5" in the upper extremities bilaterally due to back discomfort, but the strength in his lower extremities was "5/5."  Id.  Scott's hand and finger dexterity was intact and his grip strength was "5/5" bilaterally.  Id.  With respect to his physical impairments, Dr. Klebanoff diagnosed Scott with a history of gunshot wounds, back pain, and left hand pain and weakness, and he listed his prognosis as "fair."  Id. at 357.

Dr. Klebanoff also completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)."  Id. at 358-67.  He opined that Scott could continuously lift and carry up to 10 pounds, occasionally lift and carry 11 to 20 pounds, but never lift or carry more than 20 pounds.  Id. at 358.  Dr. Klebanoff determined that Scott could sit for two hours at a time for a total of eight hours, stand for one hour at a time for a total of four hours, and walk for one hour at a time for a total of four hours in an eight-hour workday.  Id. at 359.  Scott did not,

15

however, require the use of a cane to ambulate. Id. Dr. Klebanoff further opined that Scott could continuously reach, handle, finger, feel, push, and pull with his right hand, and frequently do those motions with his left hand. Id. at 360. Scott also would be able to continuously operate foot controls with either foot. Id. With respect to postural activities, Dr. Klebanoff opined that Scott could frequently balance, occasionally climb stairs and ramps, stoop, and kneel, but never climb ladders or scaffolds, crouch, or crawl. Id. at 361. In support of the postural limitations, Dr. Klebanoff noted Scott's "arm pain," "back pain," and "ROM limitation." Id. Dr. Klebanoff further opined that Scott would be able to frequently tolerate exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, and vibrations; occasionally tolerate exposure to extreme cold or heat; and never tolerate exposure to unprotected heights. Id. at 362. Finally, Dr. Klebanoff determined that Scott was able to perform activities like shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker, or two canes or crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed himself; care for personal hygiene; and sort, handle, and use paper or files. Id. at 363.

The ALJ gave Dr. Klebanoff's opinion partial weight, explaining that "the exertional limitations assessed are excessive given the minimal findings noted on the examination, including negative straight leg raises, no evident joint deformity, stable and non-tender joints, intact sensation and reflexes, intact lower extremity strength, no muscle atrophy, and intact dexterity and grip strength." Id. at 26. Moreover, the ALJ explained that "[t]he assessment [wa]s also inconsistent with [Scott's] own reports regarding his activities of daily living . . . and with the emergency room and other treatment records documenting multiple instances of

16

reported injuries that were sustained while engaging in significant physical activity, namely riding a bike." Id.

Scott disputes the ALJ's characterization of "minimal" findings by pointing to the results in the range of motion assessment performed by Dr. Klebanoff. Pl.'s Br. at 9. Dr. Klebanoff specifically relied on the range of motion test results, however, in assessing Scott's postural activity limitations. R. at 361. The ALJ incorporated the majority of these postural limitations into the RFC, limiting Scott to work that involved no climbing of ladders, ropes, or scaffolds, and only occasional climbing of stairs, stooping, kneeling, crouching, and crawling. Id. at 20, 361. Moreover, the ALJ relied on medical records that documented injuries from engaging in a level of physical activity that did not support a finding of disability. Id. at 20. For example, in March 2016, Scott suffered from a "mildly displaced intra-articular fracture of the left thumb . . . after fall off a dirt back." Id. at 339; see also id. at 453 ("[p]edal bike accident"); 470 ("hit by a car while riding his bike"); 528 (injury sustained while "trying to fix his cable dish"); 618 (injury when Scott was "a bicyclist . . . and was struck by a police car").

Moreover, as Scott acknowledges, Dr. Klebanoff's opinion was contradicted by the findings of the non-examining state agency doctor, Minda Bermudez, M.D., who opined that Scott was capable of performing medium work. Id. at 83-85. In forming this opinion, Dr. Bermudez reviewed and took into account the opinion of Dr. Klebanoff. Id. at 83. The ALJ gave Dr. Bermudez's opinion only partial weight, however, explaining that "the diagnostic imaging reports of the cervical and lumbar spine from December 2017 . . . support a finding that the claimant has a severe spinal impairment that has resulted in more significant exertional limitations than those assessed by Dr. Bermudez based on the evidence available for h[er] review in September 2016." Id. at 25. In particular, the ALJ relied on medical imaging results for the

cervical spine that found herniations in the cervical spine at C2-3, C3-4, C4-5, and C6-7; disc bulging at C5-6; and straightening of the normal cervical lordosis without fracture or dislocation, id. at 499, and medical imaging results for the lumbar spine that found degenerative disc disease with left intraforaminal disc herniation at L3-4 and degenerative disc disease with disc bulge and left intraforaminal disc herniation at L4-5, id. at 501.

Scott asserts that in failing to adopt Dr. Klebanoff's opinion that he should be limited to standing for one hour at a time for a total of four hours in the workday, the ALJ was relying on her own "lay opinion" of Scott's limitations. Pl.'s Br. at 11. This assertion is meritless. Determining a claimant's RFC is an administrative task to be performed by the ALJ. See Chandler v. Comm'r Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). As the Chandler court explained:

> The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. *See* 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c). Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records, *see, e.g.,* 20 C.F.R. § 404.1527(d)(1)-(2), "[t]he law is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity."

667 F.3d at 361 (quoting Brown v. Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011)). Thus, an ALJ is not bound by the specific functional ratings set by a physician in a medical source form. See id. at 362 (ALJ could extrapolate RFC from medical evidence in the record); Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006) (ALJ may adopt RFC findings that have not been stated by physician). "Surveying the medical evidence to craft an RFC is part of the ALJ's duties." Titterington, 174 F. App'x at 11. Here, the ALJ's decision not to credit the limitations on standing and walking found in Dr. Klebanoff's opinion because they were inconsistent with the other medical evidence of record was supported by substantial evidence and an adequate explanation.

18

### E. Scott's Claim That the ALJ Failed to Properly Address His Fatigue Provides No Basis for a Remand

Scott claims that the ALJ erred by failing to discuss his fatigue and how it would impact his ability to perform light work on a sustained basis. Pl.'s Br. at 11-12. This contention does not undermine the ALJ's decision.

Scott did not include fatigue on his Disability Report as one of the conditions limiting his ability to work. R. at 75-76. As discussed supra in Section IV(B), at the hearing before the ALJ, Scott's counsel focused exclusively on Scott's physical impairments, namely back pain, as the basis of his disability. Scott's counsel did not mention his fatigue at all during the hearing. Id. at 36-73. Even when prompted by his attorney about whether "they covered all of [his] other problems besides the back," neither Scott nor his counsel referenced any issues with fatigue. Id. at 61-62. It is the claimant's burden to submit evidence establishing the presence of a disability and its severity. See 20 C.F.R. § 416.912; Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). When an applicant for Social Security benefits is represented by counsel, he or she "'is presumed to have made his [or her] best case before the ALJ.'" Vivaritas v. Comm'r of Soc. Sec., 264 F. App'x 155, 158 (3d Cir. 2008) (quoting Skinner v. Astrue, 478 F.3d 836, 842 (7th Cir. 2007)); Wert v. Comm'r of Soc. Sec., No. 13-5705, 2015 WL 1808594, at *12 (E.D. Pa. Apr. 21, 2005). "The onus is therefore on counsel to ensure that the ALJ is aware of all of the evidence favorable to a claimant's case and to probe all of the relevant issues." Harrison v. Colvin, No. 14-719, 2014 WL 5148156, at *4 (W.D. Pa. Oct. 14, 2014) (citing Turby v. Barnhart, 54 F. App'x 118, 122-23 (3d Cir. 2002)); Wert, 2015 WL 1808594, at *12. Thus "it is well-settled that '[t]here is no requirement that an ALJ consider impairments that a claimant does not allege are disabling.'" Galbreath v. Colvin, No. 3:13-CV-2157, 2014 WL 4923233, at *14 (M.D. Pa. Sept. 30, 2014) (quoting Podsiad v. Astrue, No. 07-841-SLR-LPS, 2010 WL 662211, at *21 (D. Del. Feb. 22,

19

2010)); accord Askins v. Colvin, No. 3:13-CV-2415, 2014 WL 5586553, at *12 (M.D. Pa. Oct. 31, 2014) (ALJ did not have an obligation to address impairments that the plaintiff did not allege were disabling in either the disability application or at the hearing); Chaplick v. Colvin, No. 3:13-CV-0745, 2014 WL 4258333, at *17 (M.D. Pa. Aug. 26, 2014) (same).

Nevertheless, the ALJ addressed Scott's fatigue in her opinion, noting that "[d]uring the consultative examination, the claimant was also lethargic, reportedly due to the side effects from medication." R. at 19; see also id. at 21. The ALJ also found that the consultative examiner "noted that the claimant was energized, coherent, and enthused at times and was generally alert and oriented." Id. at 19. Consequently, the ALJ assessed moderate limitations in Scott's concentration, persistence, and pace. This assessment was supported by substantial evidence and, therefore, a remand is not warranted.

## IV. CONCLUSION

For the reasons set forth above, I find that the ALJ's decision is supported by substantial evidence. Accordingly, Plaintiff's Request for Review will be denied and dismissed. An appropriate Order follows.

Dated: December 13, 2019

                                      BY THE COURT:

                                      */s/ Marilyn Heffley*
                                      MARILYN HEFFLEY
                                      UNITED STATES MAGISTRATE JUDGE